UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ROBERT KATSNELSON,

                               Plaintiff,

                                                  **MEMORANDUM AND ORDER**
       -against-                                22-CV-406-EK-SJB

CITIBANK NATIONAL ASSOCIATION,

                               Defendant.
-----------------------------------------------------------------X

**BULSARA, United States Magistrate Judge:**

       Defendant Citibank National Association ("Citibank") has filed a motion seeking to compel Plaintiff Robert Katsnelson ("Katsnelson") to arbitrate his claims, which all arise under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x. (Mot. to Compel Arbitration dated June 6, 2023 ("Def. Mot."), Dkt. No. 71). The motion is denied without prejudice on the basis of disputed facts about the receipt of an agreement to arbitrate. Following the evidentiary hearing discussed herein, Citibank may renew its motion.

       Citibank contends it issued Katsnelson a Citibank Costco Anywhere Visa credit card around November 25, 2016. (Mem. of Law in Supp. of Mot. to Compel Arbitration ("Def. Mem."), attached as Ex. 1 to Def. Mot., at 4). The terms of that account are governed by an agreement enclosed with the card (the "Card Agreement"), and the Agreement contains an agreement to arbitrate any claims against Citibank. Citibank's motion contends that the Card Agreement requires Katsnelson to arbitrate the claims raised in this suit.

Citibank's motion fails for one basic reason: though it provides an agreement that contains a valid arbitration clause, it has provided no proof that the Card Agreement was ever sent to Katsnelson.  Such proof is usually easy to procure, for example, in an affidavit that states that Citibank's typical business practice was to send the Card Agreements to cardholders.  But such proof is absent here.  And in the face of Katsnelson's denial of receipt of the Agreement, it is impossible to compel arbitration at this stage of the case.

FACTUAL BACKGROUND

Citibank's declaration states, "[a]ttached as Exhibit 1 is a copy of the letter dated November 26, 2016 that was mailed to the Plaintiff after Plaintiff opened the Costco Account.  Also attached as Exhibit 1 is a copy of the Card Agreement mailed to the Plaintiff with the actual credit card, which contains an arbitration agreement." (Decl. of Kelly Booth dated June 6, 2023 ("Booth Decl."), attached as Ex. 2 to Def. Mot., ¶ 6).  The first document in Exhibit 1 is the November 26, 2016 letter that was sent to Katsnelson. (Letter dated Nov. 26, 2016, attached as Ex. 1 to Booth Decl.).  The November 26, 2016 letter states "[y]our new card will be arriving soon." (*Id.* at 1).  The Card Agreement in Exhibit 1 has a date of 2016.  (Card Agreement, attached as Ex. 1 to Booth Decl., at 11).

Katsnelson avers that he received two credit cards from Citibank (one for himself and one for his mother) but he "did not receive the card agreement." (Decl. of Robert Katsnelson in Opp'n to Mot. to Compel Arbitration dated June 21, 2023 ("Katsnelson Decl."), Dkt. No. 74 ¶ 3 ("I vehemently deny receiving the card member agreement with the card or receiving it by separate mail.")).  And he says that had he received such an agreement, he would have "rejected" the arbitration agreement because of his preference to be in federal court. (*Id.* ¶ 5).

DISCUSSION

In a contractual dispute implicating interstate commerce, an arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *All. Bernstein Inv. Rsch. & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006) ("[T]he Federal Arbitration Act (the 'FAA') creates a 'body of federal substantive law of arbitrability' applicable to arbitration agreements . . . affecting interstate commerce." (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983))); *see also Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1919 (2022).[1]

Section 2 of the FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution." *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001); *see Man Fong Wong v. 1st Disc. Brokerage, Inc.*, No. 10-CV-1487, 2011 WL 1298857, at *2 (E.D.N.Y. Jan. 6, 2011) ("The Federal Arbitration Act . . . establishes a 'federal policy favoring arbitration,' requiring federal courts to 'rigorously enforce agreements to arbitrate.'" (quoting *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987))), *report and recommendation adopted*, 2011 WL 1235756, at *1 (Mar. 31, 2011). Indeed, Section 2 "renders agreements to arbitrate enforceable as a matter of federal law." *Moriana*, 142 S. Ct. at 1917.

> Parties may generally shape [arbitration] agreements to their liking by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes. Whatever they settle on, the task for courts and arbitrators at bottom remains the same: to give effect to the intent of the parties.

---

[1] "The parties do not dispute that the agreement at issue here affects interstate commerce and, accordingly, there is no question that the FAA applies." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010).

3

*Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) (quotations and citation omitted).[2]

Because arbitration agreements are subject to the same principles as other contracts, "a party may be compelled to arbitrate a dispute only to the extent he or she has agreed to do so." *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 569 (S.D.N.Y. 2009) (citing *Bell v. Cendant Corp.*, 293 F.3d 563, 566–67 (2d Cir. 2002)); *see also Bynum v. Maplebear Inc.*, 160 F. Supp. 3d 527, 533–34 (E.D.N.Y. 2016) ("Arbitration is a matter of contract.  When enforcing an arbitration agreement, as with any other contract, the parties' intentions control." (quotations and citations omitted)).

"In deciding whether a dispute is arbitrable, [the Court] must answer two questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015) (quotations omitted).  The party resisting arbitration bears the burden of showing that the arbitration agreement is invalid or does not encompass the claims at issue.  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

Here, much is not in dispute.  Katsnelson does not dispute that the agreement proffered by Citibank contains a valid and binding arbitration agreement, or that the provisions of that agreement would require the claims in this suit to be arbitrated.  Nor

---

[2] Under the FAA, a party may petition the court "for an order directing . . . arbitration [to] proceed in the manner provided for in [an] agreement," and once the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, [it] shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.

4

does he dispute that he received the credit cards issued by Citibank. Instead, he asserts that he never received the Card Agreement, and therefore cannot be bound by its terms.

Citibank's declaration states that the Card Agreement was mailed "with the actual credit card," (Booth Decl. ¶ 6), but this assertion is both misleading and incomplete. The declaration provides no date on which the credit card (and the corresponding Agreement) was mailed. The document supporting this statement, Exhibit 1, appears to be a generic 2016 Card Agreement. There is no indication on its face that it was mailed to Katsnelson. Exhibit 1 also includes a November 2016 letter to Katsnelson, but that letter also does not purport to include the Card Agreement. In fact, it announces that Katsnelson *will* be receiving the credit card. In other words, the November 2016 letter reflects Citibank's future intention to send the card. It, therefore, reflects a future intention to send the Card Agreement with the credit card. The letter is not proof of the actual mailing of either the credit card or the Card Agreement.

By presenting Exhibit 1 as a composite single exhibit, Citibank leaves the impression that it is providing proof that the Card Agreement was mailed to Katsnelson. Neither the generic 2016 Agreement nor the letter about a future mailing of the card demonstrates that the Card Agreement was mailed to Katsnelson. And thus there is no actual proof that the Agreement was sent, as the declaration asserts, "with the actual credit card." (Booth Decl. ¶ 6). Although Citibank's declaration also states that Citibank's records do not show that the Card Agreement was returned as undeliverable, (*id.* ¶ 7), it is unclear what that demonstrates, without some proof the Agreement was actually mailed in the first place. It merely begs the question of when and what was mailed. Citibank does not appear to know when the Card Agreement was mailed to

5

Katsnelson and makes unsupported (at least at this time) inferences to have the Court conclude that the Agreement was included with the card.

In other words, Citibank's misleading declaration elides the crucial fact: what in its records establishes that Katsnelson was mailed the Agreement, along with the credit card. Citibank could have provided a declaration from a person who actually created or sent the mailing back in 2016. Such a person could have said "Katsnelson was sent the Card Agreement," on a certain date in 2016. But Citibank's declarant is someone else: a person who conducted a review of Citibank's records—she never says she prepared the mailing or sent it back in 2016. And the review of the records the declarant provides only shows that no mail was returned, not that the Card Agreement was sent.

Alternatively, Citibank could have provided a declaration from someone with knowledge of its 2016 business practices who avers that the customary practice in 2016 was to include the Agreement with every credit card. But there is no such statement in the declaration. At one point the declaration states: "Citibank's records confirm that Plaintiff was sent the Card Agreement mailing for the Costco Account but did not choose to reject the arbitration agreement." (*Id.* ¶ 9). This statement seems to suggest that Citibank's records show proof of the mailing of the Card Agreement. But the next sentence reveals that this statement (like others made in the declaration) is not what it seems. The next sentence states: "I can determine this because it was Citibank's regular practice to include a note in the computerized account records of those card members who chose to opt out." (*Id.*). In other words, we are back to where we began: Citibank's records only show that there was no opting out of the Agreement; that is only relevant proof, if there is some proof that the Card Agreement was first mailed to Katsnelson. And again, while that initial proof can come in the form of customary and regular

6

business practices, all Citibank has provided—in a misleading fashion through a consolidated exhibit—is its conclusory statement that "the Card Agreement [was] mailed to the Plaintiff with the actual credit card," (*id.* ¶ 6)—without a date, proof, or regular business practice from which to infer its validity.

As noted, Katsnelson avers he "did not receive the card agreement," (Katsnelson Decl. ¶ 3); *supra* at 2, and "[t]here is nothing . . . to suggest that nonmovants' affidavits alone cannot—as a matter of law—suffice to defend against" a motion to compel arbitration. *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (alterations in original) (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998)). In other words, there is a disputed fact about receipt of the Card Agreement, and thus a disputed question of fact about whether the parties here agreed to submit their claims to arbitration.

Citibank's legal arguments do not save its motion. First, Citibank relies on the mailbox rule, but as the very case it cites indicates, the mailbox rule applies when "the record establishes office procedures, followed in the regular course of business, pursuant to which notices have been addressed and mailed." *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010). Citibank's declaration does not talk about the "routine office procedures" in place in 2016. There is no statement that Citibank's procedures included providing the Card Agreement with every credit card, or that such procedures were in place in 2016.

Citibank's brief repeats the assertion that the Card Agreement was "mailed to the Plaintiff with the actual credit card, which contains an arbitration agreement." (Reply in Supp. of Mot. to Compel Arbitration ("Def. Reply"), Dkt. No. 76 at 4 (quoting Booth Decl. ¶ 6)). But as noted, the Exhibit supporting this statement contains a generic

7

agreement—not one sent to Katsnelson—combined with a letter to Katsnelson that did not contain the Agreement; and the only other support is the negative inference that the Agreement was never rejected or returned as undeliverable. (Booth Decl. ¶ 7). That again assumes what Citibank has to actually prove: that it mailed the Card Agreement with the credit card. In other cases, Citibank has provided more than a conclusory assertion of mailing, and provided the very minimal proof required to demonstrate that an arbitration agreement was sent to a cardholder. *E.g.*, *McCormick v. Citibank, NA*, No. 15-CV-46, 2016 WL 107911, at *4 (W.D.N.Y. Jan. 8, 2016) ("[T]he matters set forth in the sworn affidavit . . . provide compelling circumstantial evidence of Citibank's compliance with its customary policy upon acquisition of a merchant credit card portfolio to provide current account holders with a printed copy of the new agreement governing the account, along with the separate written Notice of Change in Terms and Right to Opt Out, as well as additional notice as provided in the next monthly periodic billing statement."); *see also, e.g.*, *Bakon v. Rushmore Serv. Ctr., LLC*, No. 16-CV-6137, 2017 WL 2414639, at *2 (E.D.N.Y. June 2, 2017) ("Rushmore offers . . . testimony that it was Premier's custom to direct its vendor to mail the Agreement with each new credit card when an account was opened, and that it directed its vendor to do so in this case."). The proof in those cases stands in stark contrast to the conclusory unsupported assertions provided by Citibank here.

      Nor is Citibank's motion saved by South Dakota law. South Dakota law—which Katsnelson does not dispute governs the Agreement—provides that the use of the credit card binds the user to the contract terms. *Haynes v. TransUnion, LLC*, No. 19-CV-7157, 2021 WL 7906567, at *6 (E.D.N.Y. Sept. 30, 2021) ("[U]nder South Dakota law, 'use of an accepted credit card or the issuance of a credit card agreement and the expiration of

8

thirty days from the date of issuance without written notice from a card holder to cancel the account creates a binding contract between the card holder and the card issuer.'" (quoting S.D. Codified Laws § 54-11-9)), *adhered to on reconsideration*, 2022 WL 1228927, at *6 (Apr. 25, 2022); s*ee also Ackerberg v. Citicorp USA, Inc.*, 898 F. Supp. 2d 1172, 1176 (N.D. Cal. 2012) ("Numerous courts have found that continued use or failure to opt out of a card account after the issuer provides a change in terms, including an arbitration agreement, evidences the cardholder's acceptance of those terms.") (collecting cases).  It is certainly undisputed that Katsnelson used the card, but Citibank cites no authority for the proposition that use of a card binds a party to contract terms he has not received.  Indeed, cases applying South Dakota law appear to uniformly suggest that use binds a party to *received* terms, not unknown ones.  *E.g.*, *Dalal v. Costco Wholesale*, No. 22-CV-5593, 2023 WL 2662347, at *3 (D.N.J. Mar. 28, 2023) ("[A] cardholder's decision to use a credit card he or she has been issued constitutes assent to the terms of the offer extended by the card's issuer, such that a binding contract is formed." (citing S.D. Codified Laws § 54-11-9)); *Wheeler v. Cavalry SPV I, LLC*, 593 F. Supp. 3d 878, 882–83 (W.D. Wis. 2022) ("Citibank has no record of Wheeler closing her account; indeed, defendant has shown that plaintiff continued to use her card after receiving the 2016 Agreement.  Thus, the mailing of the 2016 Agreement constituted an offer and Wheeler's continued use of her card was an acceptance of the terms and conditions—including the arbitration clause—set forth in the Agreement." (citing S.D. Codified Laws § 54-11-9)); *Hartranft v. Encore Cap. Grp., Inc.*, 543 F. Supp. 3d 893, 920 (S.D. Cal. 2021) ("Plaintiff agreed to arbitrate by failing to rebut the evidence that he (1) received the Card Agreement and (2) used his card following receipt of the new terms.").  As does the Second Circuit when faced with the

9

same issue under New York law.  *See Barrows*, 36 F.4th at 53 ("Brinker offers the alternative argument (not reached by the district court) that under New York law, a party can manifest assent to a contract, including an arbitration agreement, by continuing to work after being made aware of the agreement, even if she never actually signs it.  The problem for Brinker, though, is that such course-of-conduct cases require, at a minimum, that an employee have received the agreement (or otherwise had the chance to learn of the agreement's existence)." (citations omitted)).

"None of this is to say, of course, that [Katsnelson's] declaration, or . . . account of events is, in fact, accurate.  At this stage, we do not know.  But in deciding a motion to compel arbitration, . . . a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact.  And to the extent this case turns on . . . credibility or trustworthiness, the place to sort it out is, as the FAA provides, at trial."  *Id*. at 54 (quotations and citation omitted).

The Court will hold an evidentiary hearing on **October 24, 2023 at 11:00 A.M.** limited to the question of whether Katsnelson received the Card Agreement.  Each party shall provide the Court with a list of witnesses who will testify and copies of any proposed exhibits by **October 17, 2023**.

SO ORDERED.

*/s/Sanket J. Bulsara*
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York
September 8, 2023